**METRO–GOLDWYN–MAYER, INC., et al., Plaintiffs,**

v.

**AMERICAN HONDA MOTOR CO., INC., et al., Defendants.**

**No. CV 94–8732–KN (Mcx).**

United States District Court, C.D. California.

March 29, 1995.

Kaye, Scholer, Fierman, Hays & Handler, Pierce O'Donnell, Robert Barnes, Ann Marie Mortimer, Los Angeles, CA, for Plaintiffs Metro–Goldwyn–Mayer Inc. and Danjaq, Inc.

Amy D. Hogue, Julie G. Duffy, Pillsbury Madison & Sutro, Los Angeles, CA, for Defendants American Honda Motor Co., Inc. and Rubin Postaer and Associates.

## ORDER RE: (1) MOTION FOR PRELIMINARY INJUNCTION; (2) MOTION FOR SUMMARY JUDGMENT

KENYON, District Judge.

Based on the papers submitted and the brief arguments presented at the March 13, 1995 hearing, the Court **GRANTS** Plaintiffs' motion for a preliminary injunction and **DENIES** Defendants' motion for summary judgment for the reasons set forth below.[1] Plain-

---

**1.** During a February 10, 1995 telephone conference with counsel, the Court proposed that the

parties proceed to an expedited trial on the merits in lieu of proceeding on Plaintiffs' preliminary

tiffs are **ORDERED** to post a bond in the amount of $6,000,000 for this preliminary injunction to issue.

The Court **ORDERS** that Defendants, their agents, employees, representatives, and all others purporting to work, or working, on their behalf, be, and by this order are, enjoined from continuing to infringe on Plaintiffs' copyrighted works by displaying or exhibiting in any manner, or causing to be displayed or exhibited in any manner, the Honda del Sol commercial which is the subject of this action, in any medium, including network or cable television or movie theaters.

## I. Introduction

This case arises out of Plaintiffs Metro–Goldwyn–Mayer's and Danjaq's claim that Defendants American Honda Motor Co. and its advertising agency Rubin Postaer and Associates, violated Plaintiffs' "copyrights to sixteen James Bond films and the exclusive intellectual property rights to the James Bond character and the James Bond films" through Defendants' recent commercial for its Honda del Sol automobile. *Plaintiffs' Opening Memo re: Preliminary Injunction Motion,* at 3.

Premiering last October 1994, Defendants' "Escape" commercial features a young, well-dressed couple in a Honda del Sol being chased by a high-tech helicopter. A grotesque villain with metal-encased arms[2] jumps out of the helicopter onto the car's roof, threatening harm. With a flirtatious turn to his companion, the male driver deftly releases the Honda's detachable roof (which Defendants claim is the main feature allegedly highlighted by the commercial), sending the villain into space and effecting the couple's speedy get-away.

Plaintiffs move to enjoin Defendants' commercial pending a final trial on the merits, and Defendants move for summary judgment.

## II. Factual Background

In 1992, Honda's advertising agency Rubin Postaer came up with a new concept to sell the Honda del Sol convertible with its detachable rooftop. For what was to become the commercial at issue, Rubin Postaer vice-president Gary Yoshida claims that he was initially inspired by the climax scene in "Aliens," wherein the alien is ejected from a spaceship still clinging onto the spacecraft's door. From there, Yoshida and coworker Robert Coburn began working on the storyboards for the "Escape" commercial. As the concept evolved into the helicopter chase scene, it acquired various project names, one of which was "James Bob," which Yoshida understood to be a play on words for James Bond. *Yoshida Depo.* at 45. In addition, David Spyra, Honda's National Advertising Manager, testified the same way, gingerly agreeing that he understood "James Bob to be a pun on the name James Bond." *Spyra Depo.* at 91.

While the commercial was initially approved by Honda in May 1992, it was put on hold because of financing difficulties. Actual production for the commercial did not begin until after July 8, 1994, when Honda reapproved the concept. Defendants claim that, after the initial May 1992 approval, they abandoned the "James Bob" concept, whiting out "James" from the title on the commercial's storyboards because of the implied reference to "James Bond." However, Plaintiffs dispute this assertion, pointing to the fact that when casting began on the project in the summer of 1994, the casting director specifically sent requests to talent agencies for "James Bond"-type actors and actresses to star in what conceptually could be "the

---

injunction motion. Plaintiffs were receptive to the idea, but Defendants suggested instead that they be allowed to file a motion for summary judgment, and that the Court issue a ruling on both Plaintiffs' and Defendants' motions simultaneously. The Court agreed to this procedure and calendared these two motions for March 13, 1995.

2. Defense counsel argued at the hearing that the villain's arms were normal and merely gloved. The Court's review of the commercial indicates that at the very least, the gloves contained some sort of metal in them as indicated by the scraping and clanging sounds made by the villain as he tries to get into, and hold onto, the Honda's roof.

next James Bond film."[3]

With the assistance of the same special effects team that worked on Arnold Schwarzenegger's "True Lies," Defendants proceeded to create a sixty- and thirty-second version of the Honda del Sol commercial at issue: a fast-paced helicopter chase scene featuring a suave hero and an attractive heroine, as well as a menacing and grotesque villain.

The commercial first aired on October 24, 1994, but was apparently still not cleared for major network airing as late as December 21, 1994. Plaintiffs first viewed the film during the weekend of December 17 and 18, 1994; they demanded that Defendants pull the commercial off the air on December 22; Defendants refused on December 23; and Plaintiffs filed this action on December 30, 1994. After a brief telephone conference with this Court on January 4, 1995, the Court allowed Plaintiffs to conduct expedited discovery in this matter.

On January 15, 1995, in an effort to accommodate Plaintiffs' demands without purportedly conceding liability, Defendants changed their commercial by: (1) altering the protagonists' accents from British to American; and (2) by changing the music to make it less like the horn-driven James Bond theme. This version of the commercial was shown during the Superbowl, allegedly the most widely viewed TV event of the year.

Plaintiffs filed the instant motion for preliminary injunction on January 23, 1995, and Defendants filed their summary judgment motion on February 21, 1995.

## III. *Legal Analysis*

### A. *Plaintiffs' Preliminary Injunction Motion*

#### 1. *The Preliminary Injunction Standard*

 In the Ninth Circuit, "[a] preliminary injunction may be granted if the moving party shows either (1) a combination of probable success on the merits and the possibility of irreparable harm, or (2) the existence of serious questions going to the merits, the balance of hardships tipping sharply in its favor, and at least a fair chance of success on the merits." *Senate of State of California v. Mosbacher*, 968 F.2d 974, 977 (9th Cir.1992). In essence, this test requires looking at two key elements in deciding whether an injunction should issue: the relative *merits* of the claim, and the relative *harms* to be suffered by the parties.

#### 2. *Merits Of Plaintiff's Copyright Infringement Claim*

 The required showing of likelihood of success on the merits is examined in the context of injuries to the parties and the public, and is not reducible to a mathematical formula. *See, e.g., Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109, 113 (8th Cir.1981) (rejecting idea that "likelihood" requires moving party to show better than 50–50 chance of prevailing on merits). To satisfy the "merits" prong of the preliminary injunction standard, Plaintiffs must show a "reasonable probability," at one end of the spectrum, or "fair chance," on the other, of success on the merits. *Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 422 (9th Cir.1991). Of course, a lesser showing of probability of success requires a greater showing of harm, and vice-versa. *See, e.g., id.* at 422–23.

 A claim for copyright infringement requires that the plaintiff prove (1) its ownership of the copyright in a particular work, and (2) the defendant's copying of a substantial, legally protectable portion of such work. *Pasillas v. McDonald's Corp.*, 927 F.2d 440, 442 (9th Cir.1991). "An author can claim to 'own' only an original manner of expressing ideas or an original arrangement of facts." *Cooling Systems and Flexibles, Inc. v.*

**3.** Defendants respond that this decision was solely the casting director's, and that the director was actually instructed to look for "The Avengers"-type actors. This assertion is belied by the fact that: (1) even if this is true, Defendant Rubin Postaer must have had knowledge about this because they were in charge of the overall project; (2) Plaintiffs' "Avengers" experts, Brian Clemens and David Rogers, state in their declarations that the Honda characters bear no resemblance to the "Avengers" but closely mimic "James Bond"; and (3) during his deposition, Yoshida kept on referring to the Honda protagonist as "James," which suggests that Rubin Postaer never really abandoned the concept.

*Stuart Radiator, Inc.*, 777 F.2d 485, 491 (9th Cir.1985). The plaintiff need only show that the defendant copied the protectable portion of its work to establish a prima facie case of infringement.

### a. Plaintiffs' Ownership Of The Copyrights

■ Plaintiffs claim that the Honda commercial: (1) "infringes [P]laintiffs' copyrights in the James Bond films by intentionally copying numerous specific scenes from the *films;*" and (2) "independently infringes [P]laintiffs' copyright in the *James Bond character as expressed and delineated in those films.*" *Plaintiffs' Opening Memo*, at 14.

Neither side disputes that Plaintiffs own registered copyrights to each of the sixteen films which Plaintiffs claim "define and delineate the James Bond character." *Plaintiffs' Opening Memo re: Preliminary Injunction Motion*, at 14. However, Defendants argue that because Plaintiffs have not shown that they own the copyright to the James Bond character in particular, Plaintiffs cannot prevail. *Defendants' Opposition Memo re: Preliminary Injunction Motion*, at 22 (citing *Warner Bros. Pictures, Inc. v. Columbia Broadcasting System, Inc.*, 216 F.2d 945, 949–50 (9th Cir.1954), *cert. denied*, 348 U.S. 971, 75 S.Ct. 532, 99 L.Ed. 756 (1955) (evidence at bar suggesting that assignment from author to plaintiffs did not include copyrights to author's characters) [the *Sam Spade* case] ). Specifically, Defendants claim that James Bond has appeared in two films in which Plaintiffs hold no copyright—"Casino Royale" and "Never Say Never Again"— and therefore, Plaintiffs cannot have exclusive rights to the James Bond character.

■ It appears that Defendants misconstrue Plaintiffs' claim. First, Plaintiffs do not allege that Defendants have violated Plaintiffs' copyright in the James Bond character itself, but rather in the James Bond character *as expressed and delineated in Plaintiffs' sixteen films.* To the extent that copyright law only protects original *expression*, not *ideas*,[4] Plaintiffs' argument is that

the James Bond character as developed in the sixteen films is the copyrighted work at issue, not the James Bond character generally. *See, e.g., Anderson v. Stallone*, 11 U.S.P.Q.2d 1161, 1989 WL 206431, *6 (C.D.Cal.1989) (holding that Rocky characters as developed in three "Rocky" movies "constitute expression protected by copyright independent from the story in which they are contained"). Second, there is sufficient authority for the proposition that a plaintiff who holds copyrights in a film series acquires copyright protection as well for the expression of any significant characters portrayed therein. *See, e.g., New Line Cinema Corp. v. Bertlesman Music Group*, 693 F.Supp. 1517, 1521 n. 5 (S.D.N.Y.1988) ("Because New Line has valid copyrights in the Nightmare [on Elm Street film] series, it is clear that it has acquired copyright protection as well *for the character of Freddy.*") (emphasis added); *Warner Bros. Inc. v. American Broadcasting Cos.*, 720 F.2d 231, 235 (2d Cir.1983) (same). And third, the *Sam Spade* case, 216 F.2d at 949–50, on which Defendants' rely, is distinguishable on its facts because *Sam Spade* dealt specifically with the transfer of rights from author to film producer rather than the copyrightability of a character as developed and expressed in a series of films.

Accordingly, Plaintiffs will likely satisfy the "ownership" prong of the test. *See also infra* discussion re: Plaintiffs' copyright ownership in context of summary judgment discussion, at 27–29.

### b. What Elements Of Plaintiffs' Work Are Protectable Under Copyright Law

Plaintiffs contend that Defendants' commercial infringes in two independent ways: (1) by reflecting specific scenes from the 16 films; and (2) by the male protagonist's possessing James Bond's unique character traits as developed in the films.

Defendants respond that Plaintiffs are simply trying to gain a monopoly over the "action/spy/police hero" genre which is contrary to the purposes of copyright law. Specifically, Defendants argue that the allegedly infringed elements identified by Plaintiffs are not protectable because: (1) the helicopter

4. *Roth Greeting Cards v. United Card Co.*, 429 F.2d 1106, 1109–10 (9th Cir.1970).

chase scene in the Honda commercial is a common theme that naturally flows from most action genre films, and the woman and villain in the film are but stock characters that are not protectable; and (2) under the Ninth Circuit's *Sam Spade* decision, the James Bond character does not constitute the "story being told," but is rather an unprotected dramatic character.

**(1)** *Whether Film Scenes Are Copyrightable*

▮▮▮▮▮ In their opening brief, Plaintiffs contend that each of their sixteen films contains distinctive scenes that together comprise the classic James Bond adventure: "a high-thrill chase of the ultra-cool British charmer and his beautiful and alarming sidekick by a grotesque villain in which the hero escapes through wit aided by high-tech gadgetry." *Plaintiffs' Opening Memo re: Preliminary Injunction Motion*, at 20. Defendants argue that these elements are naturally found in any action film and are therefore unprotected "scenes-a-faire." [5]

Both sides provide expert testimony to support their claims that such scenes are distinctive or generic, and both sides question the qualifications—and hence, the testimony—of the others' experts. [6] Indeed, there is a notable difference in the backgrounds of the parties' experts. Plaintiffs' impressive array of James Bond experts includes: (1) Lee Pfeiffer, a writer and James Bond expert whose 1992 book is entitled "The Incredible World of 007"—he has appeared on many radio and television programs as a James Bond expert; (2) Richard B. Jewell, a professor at the USC School of

Cinema–Television who recently taught a course on James Bond films in the Spring of 1994; (3) Mark Cerulli, a writer/producer at HBO who has written articles and film reviews of many of the Bond films; (4) Drew Casper, a professor and film historian at the USC School of Cinema–Television; and (5) Irwin Coster, president of Coster Music Research Enterprises, Inc. Defendants' less-impressive expert list includes: (1) Arnold Margolin, a writer and producer, who considers himself to be "conversant with the genre to which James Bond and his films belong," because he has been a fan of Bond films since 1959 and has written several screenplays in the "spy film" genre; and (2) Hal Needham, a movie director responsible for the "Cannonball Run" and "Smokey and the Bandit" comedy film series.

Plaintiffs' experts describe in a fair amount of detail how James Bond films are the source of a genre rather than imitators of a broad "action/spy film" genre as Defendants contend. Specifically, film historian Casper explains how the James Bond films represented a fresh and novel approach because they "hybridize[d] the spy thriller with the genres of adventure, comedy (particularly, social satire and slapstick), and fantasy. This amalgam ... was also a departure from the series' literary source, namely writer Ian Fleming's novels." *Casper Decl.*, ¶ 9. Casper also states: "I also believe that this distinct melange of genres, which was also seminal ... created a protagonist, antagonist, sexual consort, type of mission, type of

---

**5.** Situations, incidents, or events that naturally flow from a common theme, or setting or basic plot premise are "scenes-a-faire." *See, e.g., Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir.1930), *cert. denied*, 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931); 3 M. & D. Nimmer, *Nimmer on Copyright*, § 13.03[B][4], at 13–80–82 (1994) (discussing scenes-a-faire doctrine). In *Universal City Studios v. Film Ventures International, Inc.*, 543 F.Supp. 1134, 1141 (C.D.Cal.1982), this Court granted a preliminary injunction to the copyright holders of "Jaws" finding that they were likely to prevail on the issue of intrinsic substantial similarity against the movie "Great White," another shark-attack film. In so doing, the Court rejected the defendants' characterization of the plaintiffs' expression of ideas as unprotectable scenes-a-faire: "The Court rejects Defendants' overly expansive view

of that which falls within the unprotected sphere of general ideas and scenes a faire, and instead adopts Plaintiffs' characterization of that which constitutes the expression of ideas." *Id.* at 1141. It appears that in this case, as in *Universal*, Defendants are attempting to claim that all elements of the commercial are unprotected, and therefore, the commercial as a whole is non-infringing. This Court rejected this approach in *Universal*, and does so here as well.

**6.** As discussed and agreed upon by the parties during the February 10, 1995 telephone status conference, the Court stated that it would not rule specifically on each of the myriad objections interposed by both parties, but would instead refer to the experts' declarations when helpful and admissible.

exotic setting, type of mood, type of dialogue, type of music, etc. that was not there in the subtype of the spy thriller films of that ilk hitherto." *Id.,* ¶ 11. In addition, Professor Jewell and Lee Pfeiffer describe the afore-mentioned elements in more detail and how these are in essence copied by the Honda commercial.[7]

Based on Plaintiffs' experts' greater famil-iarity with the James Bond films, as well as a review of Plaintiffs' James Bond montage and defense expert Needham's video mon-tage of the "action/spy" genre films, it is clear that James Bond films are unique in their expression of the spy thriller idea. A filmmaker could produce a helicopter chase scene in practically an indefinite number of ways, but only James Bond films bring the various elements Casper describes together in a unique and original way.

Thus, the Court believes that Plaintiffs will likely succeed on their claim that their ex-pression of the action film sequences in the James Bond films is copyrightable as a mat-ter of law.[8]

### (2) *Whether James Bond Character Is Copyrightable*

The law in the Ninth Circuit is un-clear as to when visually-depicted characters such as James Bond can be afforded copy-right protection. In the landmark *Sam Spade* case, *Warner Bros.,* 216 F.2d at 950, the Ninth Circuit held that the *literary* char-acter Sam Spade was not copyrightable be-cause he did not constitute "the story being told." The court opined: "It is conceivable that the character really constitutes the story being told, but if the character is only the chessman in the game of telling the story he is not within the area of the protection af-forded by the copyright." *Id.*

Two subsequent Ninth Circuit decisions have cast doubt on the continued viability of the *Sam Spade* holding as applied to graphic characters. In *Walt Disney Productions v. Air Pirates,* 581 F.2d 751, 755 (9th Cir.1978), *cert. denied,* 439 U.S. 1132, 99 S.Ct. 1054, 59 L.Ed.2d 94 (1979), the circuit panel held that several Disney comic book characters were protected by copyright. In acknowledging the *Sam Spade* opinion, the court reasoned that because "comic book characters ... are distinguishable from literary characters, the [*Sam Spade*] language does not preclude protection of Disney's characters." *Id.* The *Air Pirates* decision may be viewed as either: (1) following *Sam Spade* by implicitly holding that Disney's graphic characters constituted the story being told; or (2) applying a less stringent test for the protectability of graph-ic characters. *See Anderson,* 1989 WL 206431, at *6–7 (identifying two views and citing 1 M. Nimmer, *The Law of Copyright,* § 2–12, at 2–176 (1988) (interpreting *Air Pi-rates* as limiting the "story being told" test to word portraits, not graphic depictions)). One rationale for adopting the second view is that, "[a]s a practical matter, a graphically depicted character is much more likely than a literary character to be fleshed out in sufficient detail so as to warrant copyright protection." *Anderson,* 1989 WL 206431, at *7. However, as one district court warned, "this fact does not warrant the creation of separate analytical paradigms for protection of characters in the two mediums." *Id.*

A second Ninth Circuit opinion issued in 1988 did little to clarify *Air Pirates'* impact on the *Sam Spade* test. In *Olson v. Nation-al Broadcasting Co.,* 855 F.2d 1446, 1451–52 n. 6 (9th Cir.1988), the court cited with ap-proval the *Sam Spade* "story being told" test and declined to characterize this language as

---

**7.** In response, Defendants' expert Needham sug-gests that the three 1960s British television series "The Avengers," "The Saint," and "Danger Man" are precursors of the Bond films and that the Bond films copy from them. Furthermore, expert Margolin goes through an extrinsic test analysis of the differences between Plaintiffs' films and the Honda commercial.

In rebuttal, Plaintiffs present the declarations of: (1) Brian Clemens, who produced many epi-sodes of "The Avengers" and "Danger Man," as well as having worked on "The Saint"; and (2)

David Rogers, a leading authority on "The Avengers" and Patrick McGoohan, the star of "Danger Man." Both experts state that no part of the Honda commercial resembles either the "The Avengers," "Danger Man," or "The Saint," and that the commercial is a copy of a James Bond film.

**8.** Of course, these film sequences would be only "scenes-a-faire" without James Bond. It is Bond that makes a James Bond film as the following section bears out.

dicta. Later in the opinion, the court cited the *Air Pirates* decision along with Second Circuit precedent,[9] recognizing that "cases subsequent to [the *Sam Spade* decision] have allowed copyright protection for characters who are especially distinctive." *Id.* at 1452. *Olson* also noted that "copyright protection may be afforded to characters visually depicted in a television series or in a movie." *Id.* However, later in the opinion, the court distanced itself from the character delineation test applied by these other cases, referring to it as "the more lenient standard[ ] adopted elsewhere." *Id.*

There have been no Ninth Circuit cases on the protectability of visually-depicted characters since *Olson*, and therefore, it behooves this Court to analyze James Bond's status under the *Sam Spade*/*Olson*/Ninth Circuit "story being told" test, as well as under the *Air Pirates*/Second Circuit "character delineation" test.

Predictably, Plaintiffs claim that under either test, James Bond's character as developed in the sixteen films is sufficiently unique and deserves copyright protection, just as Judge Keller ruled that Rocky and his cohorts were sufficiently unique. *See Anderson*, 1989 WL 206431, at *7–8. Plaintiffs point to various character traits that are specific to Bond—i.e. his cold-bloodedness; his overt sexuality; his love of martinis "shaken, not stirred;" his marksmanship; his "license to kill" and use of guns; his physical strength; his sophistication—some of which, Plaintiffs' claim, appear in the Honda commercial's hero.

On the other hand, Defendants assert that, like Sam Spade, James Bond is not the "story being told," but instead "has changed enormously from film to film, from actor to actor, and from year to year." *Defendants' Opp. Memo re: Preliminary Injunction Motion*, at 22. Moreover, Defendants contend

that even if Bond's character is sufficiently delineated, there is so little character development in the Honda commercial's hero that Plaintiffs cannot claim that Defendants copied more than the broader outlines of Bond's personality. *See, e.g., Smith v. Weinstein*, 578 F.Supp. 1297, 1303 (S.D.N.Y.), *aff'd*, 738 F.2d 419 (2d Cir.1984) ("no character infringement claim can succeed unless plaintiff's original conception sufficiently developed the character, and defendants have copied this development and not merely the broader outlines").

Reviewing the evidence and arguments, the Court believes that James Bond is more like Rocky than Sam Spade—in essence, that James Bond is a copyrightable character under either the *Sam Spade* "story being told test" or the Second Circuit's "character delineation" test. Like Rocky,[10] Sherlock Holmes, Tarzan, and Superman,[11] James Bond has certain character traits that have been developed over time through the sixteen films in which he appears. Contrary to Defendants' assertions, because many actors can play Bond is a testament to the fact that Bond is a unique character whose specific qualities remain constant despite the change in actors. *See* Pfeiffer and Lisa, *The Incredible World of 007*, at 8 ("[Despite the different actors who have played the part] James Bond is like an old reliable friend."). Indeed, audiences do not watch Tarzan, Superman, Sherlock Holmes, or James Bond for the story, they watch these films to see their heroes at work. A James Bond film without James Bond is *not* a James Bond film. Moreover, as discussed more specifically below, the Honda Man's character, from his appearance to his grace under pressure, is substantially similar to Plaintiffs' Bond.

Accordingly, the Court concludes that Plaintiffs will probably succeed on their claim that James Bond is a copyrightable character

---

**9.** The Second Circuit has adopted an alternate test for determining whether dramatic characters are protectable under copyright law. In the landmark case of *Nichols*, 45 F.2d at 121, the court held that copyright protection is granted to a character if it is developed with enough specificity so as to constitute protectable expression. This has been viewed to be a less stringent standard than *Sam Spade's* "story being told" test.

**10.** *See Anderson*, 1989 WL 206431, at *7 (discussing copyrightability of Rocky characters).

**11.** *See Warner Bros. Inc. v. American Broadcasting Cos.*, 654 F.2d 204, 208–09 (2d Cir.1981) (comparing Superman and the "Greatest American Hero" character and concluding that they are not substantially similar).

under either the "story being told" or the "character delineation" test.

### c. *Defendants' Alleged Infringement*

After identifying the scope of Plaintiffs' copyrightable work, the Court must focus on whether Defendants copied Plaintiffs' work. Since direct evidence of actual copying is typically unavailable, the plaintiff may demonstrate copying circumstantially by showing: (1) that the defendant had *access* to the plaintiff's work, and (2) that the defendant's work is *substantially similar* to the plaintiff's. *Shaw v. Lindheim*, 919 F.2d 1353, 1356 (9th Cir.1990).

#### (1) *Access*

To demonstrate access, the plaintiff must show that the defendant had "an opportunity to view or to copy plaintiff's work." *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1172 (9th Cir.1977). Access may not be inferred through mere "speculation or conjecture." *Ferguson v. National Broadcasting Co.*, 584 F.2d 111, 113 (5th Cir.1978). There must be a reasonable possibility to view plaintiff's work, not just a bare possibility. *See Meta–Film Associates, Inc. v. MCA, Inc.*, 586 F.Supp. 1346, 1355 (C.D.Cal.1984).

In this case, Plaintiffs contend that Defendants conceded access during the telephone conference with the Court on January 4, 1995. Defendants raise access as an issue, arguing that the inventor of the Honda commercial, Gary Yoshida, states in his declaration that he has never watched more than a few minutes of any one James Bond film, and that he got the idea for the commercial from the climax scene in "Aliens."

The Court notes that: (1) Yoshida's admission that he has at least viewed portions of the James Bond films on television; (2) the "Honda man's" having been referred to as "James Bob"; and (3) the casting director's desire to cast "James Bond"-type actors and actresses, are factors sufficient to establish Defendants' access to Plaintiffs' work. Moreover, the sheer worldwide popularity and distribution of the Bond films allows the Court to indulge a presumption of access. *See, e.g., Warner Bros. Inc.*, 654 F.2d at 208 (holding that access to Superman character assumed based on character's worldwide popularity).

Thus, the Court concludes that Plaintiffs will probably succeed on their claim that Defendants had access to Plaintiffs' work.

#### (2) *Substantial Similarity Test*

The Ninth Circuit has established a two-part process for determining "substantial similarity" by applying both the "extrinsic" and "intrinsic" tests. *Krofft*, 562 F.2d at 1164–65. "The [*Krofft* ] test permits a finding of infringement only if a plaintiff proves *both* substantial similarity of general ideas under the 'extrinsic test' and substantial similarity of the protectable expression of those ideas under the 'intrinsic test.'" *Shaw*, 919 F.2d at 1356 (emphasis in original). This "idea-expression" dichotomy is particularly elusive to courts and the substantial similarity test necessarily involves decisions made on a case-by-case basis. *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir.1960) ("Obviously, no principle can be stated as to when an imitator has gone beyond the 'idea,' and has borrowed its 'expression.' Decisions must therefore inevitably be *ad hoc.*").

##### (a) *Extrinsic Test*

The "extrinsic" test compares specific, objective criteria of two works on the basis of an analytic dissection of the following elements of each work—plot, theme, dialogue, mood, setting, pace, characters, and sequence of events. *Shaw*, 919 F.2d at 1359. Evidence is usually supplied by expert testimony comparing the works at issue. Because the extrinsic test relies on objective analytical criteria, "this question may often be decided as a matter of law." *Krofft*, 562 F.2d at 1164.

Here, both Plaintiffs' and Defendants' experts go through specific analyses of the similarities in ideas between the James Bond films and the Honda commercial. Plaintiffs contend that the commercial illegally copies specific protected portions of the James Bond films and the James Bond character itself. Defendants claim that the commercial depicts a generic action scene with a generic hero, all of which is not protected by

copyright. Alternatively, Defendants argue that they did not copy a substantial portion of any one James Bond work to be liable for infringement as a matter of law.

Viewing Plaintiffs' and Defendants' videotapes and examining the experts' statements, Plaintiffs will likely prevail on this issue because there is substantial similarity between the specific protected elements of the James Bond films and the Honda commercial: (1) the *theme, plot, and sequence* both involve the idea of a handsome hero who, along with a beautiful woman, lead a grotesque villain on a high-speed chase, the male appears calm and unruffled, there are hints of romance between the male and female, and the protagonists escape with the aid of intelligence and gadgetry; (2) the *settings* both involve the idea of a high-speed chase with the villain in hot pursuit; (3) the *mood and pace* of both works are fast-paced and involve hi-tech effects, with loud, exciting horn music in the background;[12] (4) both the James Bond and Honda commercial *dialogues* are laced with dry wit and subtle humor; (5) the *characters* of Bond and the Honda man are very similar in the way they look and act—both heros are young, tuxedo-clad, British-looking men with beautiful women in tow and grotesque villains close at hand; moreover, both men exude uncanny calm under pressure, exhibit a dry sense of humor and wit, and are attracted to, and are attractive to, their female companions.

In addition, several specific aspects of the Honda commercial appear to have been lifted from the James Bond films:

(1) In "The Spy Who Loved Me," James Bond is in a white sports car, a beautiful woman passenger at his side, driving away down a deserted road from some almost deadly adventure, when he is suddenly attacked by a chasing helicopter whose bullets he narrowly avoids by skillfully weaving the car down the road at high speed. At the beginning of the Honda commercial, the Honda man turns to his companion and says, "That wasn't so bad"; to which the woman replies, "Well, I wouldn't congratulate yourself quite yet"—implying that they had just escaped some prior danger. Suddenly, a helicopter appears from out of nowhere and the adventure begins.

(2) In "Dr. No.," the villain has metal hands. In the Honda commercial, the villain uses his metal-encased hands to cling onto the roof of the car after he jumps onto it.

(3) In "Goldfinger," Bond's sports car has a roof which Bond can cause to detach with the flick of a lever. In the Honda commercial, the Honda del Sol has a detachable roof which the Honda man uses to eject the villain.

(4) In "Moonraker," the villainous henchman, Jaws, sporting a broad grin revealing metallic teeth and wearing a pair of oversized goggles, jumps out of an airplane. In the Honda commercial, the villain, wearing similar goggles and revealing metallic teeth, jumps out of a helicopter.

(5) In "The Spy Who Loved Me," Jaws assaults a vehicle in which Bond and his female sidekick are trying to make their escape. In the Honda commercial, the villain jumps onto the roof of the Honda del Sol and scrapes at the roof, attempting to hold on and possibly get inside the vehicle.

(6) In "You Only Live Twice," a chasing helicopter drops a magnetic line down to snag a speeding car. In the Honda commercial, the villain is dropped down to the moving car and is suspended from the helicopter by a cable.[13]

---

12. In *Shaw*, the Ninth Circuit noted, in comparing two *screenplays*, that the fact that both works were "fast-paced, have ominous and cynical moods ..., and are set in large cities," did not weigh heavily in the panel's analysis because "these similarities are common to any action adventure series." 919 F.2d at 1363. Nonetheless, this situation in the case at bar is different because the mood, setting, and pace of Plaintiffs' and Defendants' works can be visually compared, as opposed to merely compared in the abstract.

13. *See also Complaint*, ¶ 30. Plaintiffs identify a seventh similarity that is less compelling, but nonetheless interesting: In "Diamonds Are Forever," Sean Connery, playing James Bond, wears a toupee to cover his, by then, balding pate, a fact widely reported in the media and repeated in the Bond literature. In the Honda commercial, once the car's roof flies off flinging the villain into the air, the woman remarks, "Don't you just love the wind through your hair?," to which the man replies, "What I have left."

In sum, the extrinsic ideas that are inherent parts of the James Bond films appear to be substantially similar to those in the Honda commercial.[14]

### (b) *Intrinsic Test*

■ The "intrinsic" test asks whether the "total concept and feel" of the two works is also substantially similar. *Litchfield v. Spielberg*, 736 F.2d 1352, 1357 (9th Cir.1984), *cert. denied*, 470 U.S. 1052, 105 S.Ct. 1753, 84 L.Ed.2d 817 (1985). This is a subjective test that requires a determination of whether the ordinary reasonable audience could recognize the Defendants' commercial as a picturization of Plaintiffs' copyrighted work. *See Berkic v. Crichton*, 761 F.2d 1289, 1292 (9th Cir.), *cert. denied*, 474 U.S. 826, 106 S.Ct. 85, 88 L.Ed.2d 69 (1985).

■ Because this is a subjective determination, the comparison during the intrinsic test is left for the trier of fact. This would involve showing the Honda commercial to the members of the jury so that they may compare the same with the sixteen Bond films at issue. Viewing the evidence, it appears likely that the average viewer would immediately think of James Bond when viewing the Honda commercial, even with the subtle changes in accent and music.

As in this Court's *Jaws* opinion, *Universal*, 543 F.Supp. at 1141, the Court finds that Defendants' attempt to characterize all of the alleged similarities between the works as scenes-a-faire to be unavailing. There are many ways to express a helicopter chase scene, but only Plaintiffs' Bond films would do it the way the Honda commercial did with these very similar characters, music, pace, and mood.[15] Plaintiffs are therefore likely to prevail on the "intrinsic test."

### (3) *Independent Creation*

■ After the plaintiff has satisfied both the "access" and "substantial similarity" prongs of the test, the burden then shifts to the defendant to show that the defendant's work was not a copy but rather was *independently created*. *Kamar Int'l, Inc. v. Russ Berrie and Co.*, 657 F.2d 1059, 1062 (9th Cir.1981).

■ Defendants claim that their commercial was independently created, as evidenced from the Yoshida declaration stating that he was inspired not by James Bond, but by "Aliens." Moreover, Defendants claim that their intent is irrelevant in determining whether their commercial infringes or not.

Plaintiffs raise two points in response: (1) there is other evidence before the Court to suggest that Honda never abandoned the idea of using James Bond as the basis for its commercial—for example, the casting director's notes, Yoshida's reference in his deposition to the Honda Man as "James," etc.; and (2) this evidence of intent is relevant to counter Defendants' claim of independent creation. *See, e.g., New Line Cinema*, 693 F.Supp. at 1530.

For the reasons discussed above, Defendants' evidence is neither very strong nor credible; it is highly unlikely that Defendants will be able to show that they created their commercial separate and apart from the James Bond concept. Accordingly, Plaintiffs should prevail on this issue.

### (4) *The Fair Use Doctrine*

■ Finally, as a separate defense to copyright infringement, Defendants claim that their use of Plaintiffs' work is protected under the fair use doctrine, which protects parodies, for example. Under the Supreme Court's recent decision in *Campbell v. Acuff–Rose Music, Inc.*, —— U.S. ——, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994), a subsequent work may not infringe on an original upon examining the following four-prong statutory factors: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational

---

14. Contrary to Defendants' implications, as a matter of law, the fact that the commercial is not a full-length movie does not preclude a finding of copyright infringement. *See, e.g., New Line Cinema*, 693 F.Supp. at 1526–27 (comparing music video to film series); *Krofft*, 562 F.2d at 1161–62 (comparing TV series to commercials).

15. During the hearing, defense counsel pointed out several differences—the fact that the "Honda man" was blonder than Bond, the fact that the commercial was more "sepia" in tone than the Bond films, etc.—that appear to this Court to be largely immaterial differences that would not be immediately apparent to the average viewer.

purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use on the potential for, or value of, the copyrighted work. *See also Harper & Row Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 547, 105 S.Ct. 2218, 2223, 85 L.Ed.2d 588 (1985) (citing 17 U.S.C. § 107). The Court shall analyze each factor in turn below.

■ First, the Court must look to whether Defendants' use is of a commercial nature and whether, and to what extent, the infringing work is transformative of the original. *Id.,* — U.S. at —, 114 S.Ct. at 1171. In *Campbell,* the Supreme Court noted that a purported parody would not be protected if it is "commentary that has no critical bearing on the substance or style of the original composition, which the alleged infringer merely uses to get attention or to avoid the drudgery in working up something fresh...." *Id.,* 114 S.Ct. at 1172. Here, Plaintiffs contend that the Honda ad is completely commercial in its nature and does not comment on the earlier Bond films. Defendants claim that their commercial is a parody on the action film genre, and further, is more than simply a commercial because of its artistic merit. On balance, Plaintiffs should prevail on this issue—the Supreme Court in *Campbell* notes that "[t]he use ... of a copyrighted work to advertise a product, even in parody, will be entitled to less indulgence under the first factor of the fair use enquiry, than the sale of the parody for its own sake...." 114 S.Ct. at 1174. *See also Tin Pan Apple, Inc. v. Miller Brewing Co.,* 737 F.Supp. 826, 832 (S.D.N.Y.1990) (beer commercial copying music video); *D.C. Comics, Inc. v. Crazy Eddie, Inc.,* 205 U.S.P.Q. 1177 (S.D.N.Y.1979) (commercial copying Superman).

Second, the Court must recognize that "some works are closer to the core of intended copyright protection than others," and thus are more deserving of protection. *Campbell,* — U.S. at —, 114 S.Ct. at 1175 & cases cited therein (e.g. fictional works are closer to the core than fact-based works). Plaintiffs view their films as just such core-

predictable work, while Defendants see their work as generic, spy thriller fare. Again, Plaintiffs should prevail on this issue because their work has created its own unique niche in the larger "action film" genre.

■ Third, the Court must look to the quantitative and qualitative extent of the copying involved. A parodist may appropriate only that amount of the original necessary to achieve his or her purpose. *See Fisher v. Dees,* 794 F.2d 432, 438 (9th Cir. 1986). The amount that may be used diminishes the less the purpose is to critique the original and the more that the parody serves as a substitute for the original. *Campbell,* — U.S. at —, 114 S.Ct. at 1176. Plaintiffs claim that the Honda commercial is a total appropriation; Defendants describe the two versions of their commercial as "de minimis" appropriation, if at all. Plaintiffs should prevail on this issue: as mentioned above, the brevity of the infringing work when compared with the original does not excuse copying.

And fourth, the Court must measure " 'the effect of the use upon the potential market for or ·value of the copyrighted work.' " *Campbell,* 114 S.Ct. at 1177 (*citing* 17 U.S.C. § 107(4)). The task is to distinguish between " 'biting criticism [that merely] suppresses demand [and] copyright infringement [which] usurps it.' " *Id.,* 114 S.Ct. at 1178 (*citing Fisher,* 794 F.2d at 438). Where the appropriation involves "mere duplication for commercial purposes," market harm is presumed. *Id.,* — U.S. at —, 114 S.Ct. at 1177. Plaintiffs allege that "one of the most commercially lucrative aspects of the copyrights is their value as lending social cachet and upscale image to cars" and that Defendants' commercial unfairly usurps this benefit. *Plaintiffs' Opening Memo re: Preliminary Injunction Motion,* at 32. Defendants counter that Plaintiffs present no evidence that their commercial will dissuade viewers from watching the Bond films. Plaintiffs should win on this issue as well; it is likely that James Bond's association with a low-end Honda model will threaten its value in the eyes of future upscale licensees.

It is clear from the foregoing discussion that Plaintiffs will likely succeed on this issue

and Defendants will be unable to show fair use or parody.

### 3. Balance Of Relative Harms

■ It is well-settled in this circuit that once a copyrightholder has shown a likelihood of success on the merits based on access and substantial similarity, irreparable injury is presumed, warranting a preliminary injunction. *See, e.g., Universal,* 543 F.Supp. at 1139. Irreparable injury is presumed because the copyright owner's right to exploit its work is unique. *Robert Stigwood Group, Ltd. v. Sperber,* 457 F.2d 50, 55 (2d Cir.1972).

■ As discussed above, Plaintiffs have established a likelihood of success on the merits and therefore, the Court presumes irreparable injury. Moreover, the Court notes that Plaintiffs have shown they have been specifically harmed by the continued airing of Defendants' commercial in two ways: (1) prolonged lost licensing revenue (purportedly in the millions of dollars); and (2) dilution of the copyrights' long-term value. The latter is especially true given Plaintiffs' own deal with BMW for a special movie tie-in in conjunction with Plaintiffs' release of the first James Bond movie in six years, "Goldeneye"—a fact undisputed by Defendants. *See Stolber Depo.,* at 81:9–84:2. Indeed, the Court can very well imagine that a majority of the public, upon viewing the Honda commercial and a future BMW ad, would come to the conclusion that James Bond was endorsing two automobile companies. Such a scenario would drastically decrease the long-term value of Plaintiffs' James Bond franchise.

■ In response, Defendants assert that aside from the fact that Plaintiffs will not prevail on the merits of their claim, the balance of equities tips in Defendants' favor for three reasons: (1) Plaintiffs have waited too long before seeking an injunction—Defendants began airing the commercial on October 24, 1994, Plaintiffs did not complain until mid-December 1994 and did not move for a preliminary injunction until January 23, 1995;

(2) Plaintiffs have waived their rights to equitable relief by not objecting to the use of the Bond character in "Cannonball Run," "Casino Royale," and "Never Say Never Again"; and (3) unlike Plaintiffs' speculative losses, Defendants have already poured in over $6 million into the Honda commercial ($2 million in production costs plus $4 million in media placement) and stand to lose much more because of the seasonal sales of the Honda del Sol,[16] should the injunction issue.

■ All three of Defendants' arguments fail because: (1) Plaintiffs' counsel states in his declaration that the commercial was not approved by any of the major networks as of December 21, 1994, and therefore, Plaintiffs' discovery of the commercial during the weekend of December 17–18, 1994 was reasonable; (2) Plaintiffs did not equitably waive their rights in the James Bond character as to "Cannonball Run" (an obvious parody), "Casino Royale" (Ian Fleming had sold the rights to "Casino Royale" before Plaintiffs acquired their movie rights to make their 16 films and Plaintiffs do not claim that the James Bond character in "Casino Royale" is the same as theirs), and "Never Say Never Again" (Plaintiffs tried to assert their rights in a British court, but the court allowed for the release of "Never Say Never Again" as a remake of Plaintiffs' "Thunderball");[17] and (3) the amount of Defendants' alleged loss, while relevant to determining the size of the bond Plaintiffs must post, does not change the Court's conclusion that the injunction should issue based on its finding that Plaintiffs are likely to prevail on their copyright claim.

### B. Defendants' Summary Judgment Motion

As stated above, Defendants move for summary judgment on Plaintiffs' copyright infringement claim on three grounds: (1) Plaintiffs are not the exclusive owners of the elements of the James Bond character they seek to protect; (2) Plaintiffs' alleged simi-

---

**16.** *See Spyra Decl. in Opposition to Preliminary Injunction,* ¶¶ 6–7.

**17.** Plaintiffs also adequately explain the existence of a very Bond-like Diet Coke commercial that

appears in Needham's film montage. Apparently, Plaintiffs contacted Coke after the spot aired, demanding that it cease and desist; Coke agreed without Plaintiffs having to resort to litigation.

larities are not protected by copyright; and (3) their commercial is not substantially similar to any of Plaintiffs' films or characters.[18]

1. *The Summary Judgment Standard*

Under Rule 56(c) of the Federal Rules of Civil Procedure, a court may grant summary judgment upon finding that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.Proc. 56(c). Under Rule 56, a non-moving party must set forth specific facts showing that there exists a genuine issue of material fact for trial. *See Kaiser Cement Corp. v. Fischbach and Moore, Inc.*, 793 F.2d 1100, 1103–04 (9th Cir.), *cert. denied,* 479 U.S. 949, 107 S.Ct. 435, 93 L.Ed.2d 384 (1986). Any inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the summary judgment motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

2. *Defendants' Motion Fails On Its Merits*

a. *Plaintiffs Own The Copyrights To The James Bond Character As Well As The 16 Films At Issue*

■ Defendants first contend that Plaintiffs do not exclusively own a copyright in "James Bond" because this visually-depicted character appeared in at least three other productions: the film and television versions of "Casino Royale" and the film version of "Never Say Never Again." Defendants primarily argue that because Plaintiffs admit that the James Bond character in "Never Say Never Again" is exactly the same character depicted in Plaintiffs' 16 films, Plain-

tiffs do not have exclusive ownership, under *Krofft,* of the James Bond character as expressed and delineated in these films.

■ Defendants' arguments fail for several reasons. First, the *Krofft* case does not stand for the proposition that a copyright-holder must have "exclusive" ownership of the copyright at issue, but only "ownership" of such a right. *Krofft,* 562 F.2d at 1162. Indeed, if this were the case, joint ownership of copyrights could never be recognized—in fact, Plaintiffs herein assert co-ownership of these rights. Second, as stated above, ownership of a copyright in a film confers copyright ownership of any significant characters as delineated therein. And third, any claim that Plaintiffs abandoned or waived their rights in the James Bond character must be accompanied by a showing of an "intentional relinquishment of a known right with knowledge of its existence and the intent to relinquish it." *United States v. King Features Entertainment, Inc.*, 843 F.2d 394, 399 (9th Cir.1988).

There is no evidence to suggest that Plaintiffs have ever relinquished their rights to the James Bond character as expressed in their films. First, Plaintiffs do not assert that the character in either of the two "Casino Royale" productions is the same as their James Bond portrayal;[19] and second, Plaintiffs heavily litigated their right to enjoin "Never Say Never Again" from ever being made—the fact that Plaintiffs lost that litigation does not mean that they waived their copyright claims, and Defendants have not cited, nor is the Court aware of, any case that stands for this proposition.[20]

18. Defendants also move to have Plaintiffs' remaining counts for false endorsement, false designation of origin, dilution of trademark and unfair competition, unfair business practices, and intentional and negligent interference with prospective business advantage, dismissed on the ground that these claims "rest on alleged substantial similarity between the Honda commercial and Plaintiffs' works...." *Defendants' Opening Memo re: Summary Judgment Motion,* at 33. However, because the Court DENIES Defendants' summary judgment motion as to the "substantial similarity" issue, the Court need not reach the further issue of whether the remaining counts should be dismissed.

19. Moreover, as mentioned above, Plaintiffs recognize that author Ian Fleming had sold the movie rights to "Casino Royale" prior to Plaintiffs' obtaining their rights to make their sixteen Bond films.

20. Aside from *Krofft,* the only other case Defendants cite is *Sam Spade,* 216 F.2d at 949–50, for the proposition that "[u]nder basic principles of copyright law, all other uses of the James Bond character affect the plaintiff's claim to ownership." *Defendants' Opening Memo re: Summary Judgment,* at 10. However, nowhere in that opinion does the Ninth Circuit make such a pronouncement; in fact, Plaintiffs correctly characterize *Sam Spade* as holding that "a copyright-

Thus, based on the evidence before it, the Court **FINDS** as a matter of law that Plaintiffs own the copyright to the James Bond character as expressed and delineated in their 16 films.

b. *The Alleged Similarities Between The Works Are Protected By Copyright*

 Next, Defendants claim, as they did in opposing Plaintiffs' preliminary injunction motion, that the similarities between the works alleged by Plaintiffs are not protectable under copyright law. Defendants' arguments are largely repetitive of those made and discussed above; however, Defendants also argue that, as a matter of law, Plaintiffs' works are entitled to only "thin" protection based on Defendants' citation to cases wherein courts have required nearly identical copying for the copyrightholder to prevail. *See, e.g., Apple Computer, Inc. v. Microsoft Corp.,* 35 F.3d 1435, 1442–44 (9th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1176, 130 L.Ed.2d 1129 (1995) (requiring copying of computer program to be nearly identical because Apple had freely licensed 90% of allegedly infringing program); *Worth v. Selchow & Righter Co.,* 827 F.2d 569, 572 (9th Cir. 1987), *cert. denied,* 485 U.S. 977, 108 S.Ct. 1271, 99 L.Ed.2d 482 (1988) (requiring greater showing of similarity between factually-

based works as opposed to between works of fiction).

But as Plaintiffs correctly point out, Defendants' cases are distinguishable on their facts and as a matter of policy. While it is understandable to require less protection of expressions of factual events or widely-licensed computer programs, conversely, it is important that this Court require greater protection for original works of fiction and the expression of the characters contained therein.

Thus, the Court **FINDS** that the instant case, which involves a careful visual delineation of a fictional character as developed over sixteen films and three decades, requires greater protection of the fictional works at issue than that accorded more factually-based or scientific works.

c. *Issues Of Material Fact Exist Precluding This Court From Concluding That The Works Are Substantially Similar*

 Finally, Defendants contend that the Honda commercial is not substantially similar—both extrinsically and intrinsically—to Plaintiffs' protected works. The Court **FINDS,** for the reasons set forth above, that Plaintiffs have presented sufficient expert testimony [21] on the extrinsic test to create a

---

holder [] *cannot* waive or abandon the protection afforded to a copyright absent an express contractual provision to that effect." *Plaintiffs' Opposition Memo re: Summary Judgment Motion,* at 26 n. 10. This proposition is fairly gleaned from the case and is consistent with the Ninth Circuit's holding in *King Features,* 843 F.2d at 399. Also, *Sam Spade* factually dealt with the idea that an author did not give up his copyrights to a character unless he specifically waived them. This case does not involve Plaintiffs asserting that Ian Fleming, the James Bond author, can no longer claim a copyright to the James Bond character; rather, this action involves Plaintiffs' right to assert a valid copyright claim against third parties without licenses or rights to the James Bond character based on Plaintiffs' specific delineation and development of the character in their 16 films.

21. Aside from the numerous declarations on file that address the "substantial similarity" issue, Plaintiffs also submitted several other expert declarations, including ones from: (1) Sir Kingley Amis, author of *The James Bond Dossier;* (2) Professor Tony Bennett, author of *Bond and Beyond: the Political Career of a Popular Hero;* and (3) John Cork, author of *James Bond in the '90s,*

a character bible for Danjaq to use with future James Bond films. Defendants object to all of these declarations on similar grounds as before: these experts won't assist the trier of fact, lack of foundation, lack of personal knowledge, etc. Again, by the February 10, 1995 agreement, the Court may rely on these declarations as it sees fit.

Defendants also move to strike Ann Marie Mortimer's declaration and the exhibits attached thereto because Plaintiffs allegedly failed to turn over these documents relevant to the two motions at issue: "Although aware of the fact that ownership and enforcement of their rights would be an issue in these motions, [P]laintiffs failed to produce the agreements pursuant to which [P]laintiffs obtained any ownership rights or copyrights or any files relating to their efforts to enforce the alleged rights in the James Bond character against others.... Now, however, at the eleventh hour, and after forcing [D]efendants to respond to a motion for preliminary injunction, [P]laintiffs have provided the Court with relevant documents." *Defendants' Objection to Mortimer Decl.,* at 3 (emphasis and citations omitted).

The Court **DENIES** this request for the following reasons: First, when Plaintiffs initially re-

triable issue as to whether the ideas expressed in the Honda commercial are substantially similar to those protected ideas that appear in Plaintiffs' films.

Moreover, because it finds that summary judgment is inappropriate under the extrinsic test, the Court is further precluded from granting summary judgment under the intrinsic test, because, at bottom, the jury must make a factual determination as to whether the Honda commercial captures the total "concept and feel" of Plaintiffs' Bond films. As the Ninth Circuit explained in *Shaw:* "Because each of us differs, to some degree, in our capability to reason, imagine, and react emotionally, subjective comparisons of literary works [and films] that are objectively similar in their expression of ideas must be left to the trier of fact." 919 F.2d at 1361.

IT IS SO ORDERED.

---

sponded to Defendants' interrogatories and document requests, Plaintiffs objected on the ground that these requests were overbroad or irrelevant. Because Defendants concede in their summary judgment motion that Plaintiffs own the rights to the sixteen films at issue here, the Court does not believe that Plaintiffs intended to deliberately withhold these documents from the defense; it appears instead that Plaintiffs honestly did not believe ownership to be a contested issue. Second, Defendants have not been prejudiced by this allegedly "late" production of Plaintiffs' evidence of ownership because Defendants clearly knew, as the Court knew, as early as February 6, 1995 (when Plaintiffs filed their reply papers in the preliminary injunction proceeding) that Plaintiffs had claimed ownership of the sixteen films and had asserted their rights in the James Bond character against other entities. Even though Plaintiffs did not produce these documents until February 27, 1995, Defendants had notice that Plaintiffs had asserted these claims; in other words, if Defendants needed to review these documents prior to that time, they could have moved to compel production, and yet they did not. As it is, Defendants had a week to analyze these documents in time to file their reply papers by March 6, 1995. Finally, and most importantly, Defendants do not contest the substantive importance or validity of the exhibits attached to the Mortimer declaration; they simply contend that the Court should not consider these documents because they were not turned over earlier. In light of the foregoing, the Court does not believe there was any gamesmanship on Plaintiffs' part here, nor was there any undue prejudice to Defendants because Plaintiffs did not file the Mortimer exhibits until February 27, 1995.