FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DENISE DANIELS; THE MOODSTERS
COMPANY,

　　　　　　*Plaintiffs-Appellants*,

　　　　　　v.

THE WALT DISNEY COMPANY; DISNEY
ENTERPRISES, INC.; DISNEY
CONSUMER PRODUCTS AND
INTERACTIVE MEDIA INC.; DISNEY
INTERACTIVE STUDIOS, INC.; DISNEY
SHOPPING, INC.; PIXAR,

　　　　　　*Defendants-Appellees*.

No. 18-55635

D.C. No.
2:17-cv-04527-
PSG-SK

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Central District of California
Philip S. Gutierrez, District Judge, Presiding

Argued and Submitted November 6, 2019
Pasadena, California

Filed March 16, 2020
Amended May 4, 2020

Before:  Jerome Farris, M. Margaret McKeown, and
Barrington D. Parker, Jr.,[*] Circuit Judges.

Order;
Opinion by Judge McKeown

---

## SUMMARY[**]

---

### Copyright

The panel filed (1) an order amending its opinion, denying a petition for panel rehearing, and denying on behalf of the court a petition for rehearing en banc; and (2) an amended opinion affirming the district court's dismissal of an action alleging copyright infringement by the Disney movie *Inside Out* of plaintiffs' characters called The Moodsters.

Affirming the denial of plaintiff's claim under the Copyright Act, the panel held that The Moodsters, lightly sketched anthropomorphized characters representing human emotions, did not qualify for copyright protection because they lacked consistent, identifiable character traits and attributes and were not especially distinctive.  The Moodsters also did not qualify for copyright protection under the alternative "story being told" test.

---

[*] The Honorable Barrington D. Parker, Jr., United States Circuit Judge for the U.S. Court of Appeals for the Second Circuit, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

The panel also affirmed the district court's denial of plaintiff's claim for breach of an implied-in-fact contract under California law, based on her disclosure of information about The Moodsters to various employees of Disney and its affiliates.

## COUNSEL

Patrick Arenz, Esq.(argued), Ronald J. Schutz and Brenda L. Joly, Robins Kaplan LLP, Minneapolis, Minnesota, for Plaintiffs-Appellants.

Mark Remy Yohalem, Esq. (argued), Glenn D. Pomerantz, Erin J. Cox, Kenneth M. Trujillo-Jamison, and Anne K. Conley, Munger, Tolles & Olson LLP, Los Angeles, California, for Defendants-Appellees.

## ORDER

The opinion filed on March 16, 2020, slip op. 18-55635, and appearing at 952 F.3d 1149, is hereby amended. An amended opinion is filed concurrently with this order.

With these amendments, the panel has voted to deny the petition for panel rehearing.

The full court has been advised of the petition for rehearing and rehearing en banc and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petition for panel rehearing and petition for rehearing en banc are **DENIED**. No further petitions for en banc or panel rehearing shall be permitted.

## OPINION

McKEOWN, Circuit Judge:

Literary and graphic characters—from James Bond to the Batmobile—capture our creative imagination. These characters also may enjoy copyright protection, subject to certain limitations. Here we consider whether certain anthropomorphized characters representing human emotions qualify for copyright protection. They do not. For guidance, we turn to *DC Comics v. Towle*, our court's most recent explanation of the copyrightability of graphically-depicted characters. *DC Comics v. Towle*, 802 F.3d 1012 (9th Cir. 2015).

Denise Daniels developed a line of anthropomorphic characters called The Moodsters, which she pitched to entertainment and toy companies around the country, including The Walt Disney Company. Under *Towle*, "lightly sketched" characters such as The Moodsters, which lack "consistent, identifiable character traits and attributes," do not enjoy copyright protection. *Id.* at 1019, 1021. We affirm the district court's dismissal of Daniels's complaint.

## BACKGROUND

### I.  The Moodsters

Daniels is an expert on children's emotional intelligence and development. She designed and promoted initiatives

that help children cope with strong emotions like loss and trauma. The Moodsters were devised as a commercial application of this work. Daniels hired a team to produce and develop her idea under the umbrella of her new company, The Moodsters Company. The initial product was The Moodsters Bible ("Bible"), a pitchbook released in 2005. It provided a concise way to convey Daniels's idea to media executives and other potential collaborators, and included a brief description of the characters, themes, and setting that Daniels envisioned for her Moodsters universe.

The Moodsters are five characters that are color-coded anthropomorphic emotions, each representing a different emotion: pink (love); yellow (happiness); blue (sadness); red (anger); and green (fear). Daniels initially named The Moodsters Oolvia, Zip, Sniff, Roary, and Shake, although these names changed in each iteration of the characters.

In 2007, Daniels and her team released a 30-minute pilot episode for a television series featuring The Moodsters, titled "The Amoodsment Mixup" ("pilot"). The pilot was later available on YouTube.

Between 2012 and 2013, Daniels and her team developed what they call the "second generation" of Moodsters products: a line of toys and books featuring The Moodsters that were sold at Target and other retailers beginning in 2015.

Daniels and The Moodsters Company pitched The Moodsters to numerous media and entertainment companies. One recurring target was The Walt Disney Company and its affiliates, including Pixar. Daniels alleges that she or a member of her team had contact with several different Disney employees between 2005 and 2009.

The claimed contact began in 2005, when a member of The Moodsters Company shared information about The Moodsters with an employee of Playhouse Disney. Daniels alleges that in 2008 she was put in touch with Thomas Staggs, the Chief Financial Officer of the Walt Disney Company, and that Staggs later informed her that he would share materials about The Moodsters with Roy E. Disney, the son of a Disney founder, and Rich Ross, the President of Disney Channels Worldwide. Finally, Daniels alleges that she spoke by phone with Pete Docter, a director and screenwriter, and they discussed The Moodsters, although no year or context for this conversation is alleged in the Complaint.

## II. Disney's *Inside Out*

Disney began development of its movie *Inside Out* in 2010. The movie was released in 2015, and centers on five anthropomorphized emotions that live inside the mind of an 11-year-old girl named Riley. Those emotions are joy, fear, sadness, disgust, and anger. Docter, who directed and co-wrote the screenplay, stated that his inspiration for the film was the manner with which his 11-year-old daughter dealt with new emotions as she matured.

## III. District Court Proceedings

Daniels filed suit against Disney in 2017 for breach of an implied-in-fact contract, arising from Disney's failure to compensate Daniels for the allegedly disclosed material used to develop *Inside Out.* Daniels then filed an amended complaint, joining The Moodsters Company as a co-plaintiff and alleging copyright infringement of both the individual Moodsters characters and the ensemble of characters as a whole.

Disney filed a motion to dismiss, asserting that Daniels failed to meet the legal standard for copyright in a character, and that the copyright "publication" of the Bible and pilot doomed Daniels's implied-in-fact contract claim. The district court granted Disney's motion to dismiss, and granted Daniels leave to file an amended complaint on the copyright claims. Disney filed a motion to dismiss the Amended Complaint, which the district court granted on the ground that The Moodsters are not protectable by copyright.

## ANALYSIS

### I. Copyright Protection for The Moodsters

Although characters are not an enumerated copyrightable subject matter under the Copyright Act, *see* 17 U.S.C. § 102(a), there is a long history of extending copyright protection to graphically-depicted characters. *See, e.g.*, *Olson v. Nat'l Broad. Co.*, 855 F.2d 1446, 1452 (9th Cir. 1988); *Walt Disney Prods. v. Air Pirates*, 581 F.2d 751, 755 (9th Cir. 1978). However, "[n]ot every comic book, television, or motion picture character is entitled to copyright protection." *Towle*, 802 F.3d at 1019. A character is entitled to copyright protection if (1) the character has "physical as well as conceptual qualities," (2) the character is "sufficiently delineated to be recognizable as the same character whenever it appears" and "display[s] consistent, identifiable character traits and attributes," and (3) the character is "especially distinctive" and "contain[s] some unique elements of expression." *Id.* at 1021 (internal citations and quotation marks removed).

### A. Application of the *Towle* Test to The Moodsters

Disney does not dispute that the individual Moodster characters meet the first prong of the *Towle* test: each has

physical as well as conceptual qualities. Because they have physical qualities, The Moodsters are not mere literary characters.

The second prong presents an insurmountable hurdle for Daniels. *Towle* requires that a character must be "sufficiently delineated to be recognizable as the same character whenever it appears." *Id.* Although a character that has appeared in multiple productions or iterations "need not have a consistent appearance," it "must display consistent, identifiable character traits and attributes" such that it is recognizable whenever it appears. *Id.*

Consistently recognizable characters like Godzilla or James Bond, whose physical characteristics may change over various iterations, but who maintain consistent and identifiable character traits and attributes across various productions and adaptations, meet the test. *See Tono Co. v. William Morrow & Co.*, 33 F. Supp. 2d 1206, 1215 (C.D. Cal. 1998) (finding that Godzilla is consistently a "pre-historic, fire-breathing, gigantic dinosaur alive and well in the modern world"), *Metro-Goldwyn-Mayer, Inc. v. Am. Honda Motor Corp.*, 900 F. Supp. 1287, 1296 (C.D. Cal. 1995) (noting that James Bond has consistent traits such as "his cold-bloodedness; his overt sexuality; his love of martinis 'shaken, not stirred;' his marksmanship; his 'license to kill' and use of guns; his physical strength; his sophistication"). By contrast, a character that lacks a core set of consistent and identifiable character traits and attributes is not protectable, because that character is not immediately recognizable as the same character whenever it appears. *See, e.g.*, *Olson*, 855 F.2d at 1452–53 (holding that television characters from "Cargo" are too "lightly sketched" to be independently protectable by copyright).

In addressing The Moodsters, we first distinguish between the idea for a character and the depiction of that character. The notion of using a color to represent a mood or emotion is an idea that does not fall within the protection of copyright. *See* 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea . . . regardless of the form in which it is described, explained, illustrated, or embodied in such work."); *see also Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 344–45 (1991) (internal quotation marks and citation removed) ("The most fundamental axiom of copyright law is that no author may copyright his ideas …."); *Frybarger v. Int'l Bus. Mach. Corp.*, 812 F.2d 525, 529 (9th Cir. 1987) ("[I]deas themselves are not protected by copyright and cannot, therefore, be infringed."). So it is no surprise that the idea of color psychology is involved in everything from decorating books to marketing and color therapy. Color and emotion are also frequent themes in children's books, such as Dr. Seuss's classic, *My Many Colored Days*, and Anna Llenas's *The Color Monster: A Story of Emotions*.

Notably, colors themselves are not generally copyrightable. *Boisson v. Banian*, 273 F.3d 262, 271 (2d Cir. 2001) ("Color by itself is not subject to copyright protection."); *see also* 38 C.F.R. § 202.1(a) ("[M]ere variations of . . . coloring" are not copyrightable). Nor is the "idea" of an emotion copyrightable. *See Feist*, 499 U.S. at 350. Taken together, these principles mean that Daniels cannot copyright the idea of colors or emotions, nor can she copyright the idea of using colors to represent emotions where these ideas are embodied in a character without sufficient delineation and distinctiveness.

In analyzing whether The Moodster characters are "sufficiently delineated," we carefully examine the graphic depiction of the characters and not the ideas underlying them. We look first to the physical appearance of The Moodsters. Unlike, for example, the Batmobile, which "maintained distinct physical and conceptual qualities since its first appearance in the comic books," the physical appearance of The Moodsters changed significantly over time. *Towle*, 802 F.3d at 1021. In the 2005 Bible and 2007 television pilot, the five Moodsters have an insect-like appearance, with skinny bodies, long ears, and tall antennas that act as "emotional barometers" to form a distinctive shape and glow when an emotion is strongly felt. By the second generation of toys, The Moodsters look like small, loveable bears. They are round and cuddly, have small ears, and each dons a detective's hat and small cape.

Mindful that physical appearance alone is not decisive, we also consider whether The Moodsters have maintained consistent character traits and attributes. Across the various iterations The Moodsters have consistently represented five human emotions, and those emotions have not changed. But other than the idea of color and emotions, there are few other identifiable character traits and attributes that are consistent over the various iterations. In the 2005 Bible, each character is described in a few short paragraphs. For example, the Zip character is described as having "an infectious laugh and wakes up each morning with a smile on his face and a friendly attitude." By the 2007 pilot, these characteristics are not mentioned and are not evident from the depiction of Zip. The other four Moodsters similarly lack consistent characteristics and attributes in the 2005 Bible and 2007 pilot. "Lightly sketched" characters of this kind, without identifiable character traits, are not copyrightable under the

second prong of *Towle*.  *See id.* at 1019 (citing *Olson*, 855 F.3d at 1452–53).

Perhaps the most readily identifiable attribute of The Moodsters is their relationship to emotions.  The 2005 Bible explains that each character relates to emotions in its own way when something new happens—the "anger" Moodster might become angry, whereas the "sad" Moodster might become sad.  The Moodsters behave in a similar fashion in the 2007 pilot, where each character is especially prone to a particular emotion such as anger or sadness.  But by 2015, the five Moodsters are "mood detectives," and help a young boy uncover how he feels about situations in his life.

Finally, in every iteration the five Moodsters each have a completely different name.  For example, the red/anger Moodster was originally named Roary in the 2005 Bible, then Rizzi in the 2007 pilot, and as of 2015 was named Razzy in Moodsters toys and the *Meet the Moodsters* storybook.  The other four characters have gone through similar name changes over the three iterations.  While a change of name is not dispositive in our analysis, these changes across each iteration further illustrate that Daniels never settled on a well-delineated set of characters beyond their representation of five human emotions.

The Batmobile in *Towle* again provides a useful contrast to this case.  There, we recognized that from the time of the 1966 television series to the 1989 motion picture, the Batmobile had numerous identifiable and consistent character traits and attributes.  It was always a "crime-fighting car" that allowed Batman to defeat his enemies. *Towle*, 802 F.3d at 1021.  It consistently had jet-engines and far more power than an ordinary car, the most up-to-date weaponry, and the ability to navigate through landscapes impassible for an ordinary vehicle. *Id.* at 1021–22.  Beyond

the emotion it represents, each Moodster lacks comparable identifiable and consistent character traits and attributes across iterations, thus failing the second prong of the *Towle* test.

Finally, even giving Daniels the benefit of the doubt on *Towle's* second prong, we conclude that The Moodsters fail the third prong—they are not "especially distinctive" and do not "contain some unique elements of expression." *Id.* (internal quotation marks and citations removed). Daniels identifies The Moodsters as unique in that they each represent a single emotion. But this facet is not sufficient to render them "especially distinctive," particularly given their otherwise generic attributes and character traits. In contrast, the Batmobile in *Towle* had a "unique and highly recognizable name," unlike each Moodster, which had three entirely different names. *Id.* at 1022. Developing a character as an anthropomorphized version of a specific emotion is not sufficient, in itself, to establish a copyrightable character. *See Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1175 (9th Cir. 2003) (declining to extend copyright protection to "the magician … dressed in standard magician garb—black tuxedo with tails, a while tuxedo shirt, a black bow tie, and a black cape with red lining" whose role is "limited to performing and revealing magic tricks"). Taken together, The Moodsters are not "especially distinctive," and do not meet the third prong of the *Towle* test.

## B. The Story Being Told Test

Since the 1950s, we have also extended copyright protection to characters—both literary and graphic—that constitute "the story being told" in a work. *Warner Bros. Pictures v. Columbia Broad. Sys.*, 216 F.2d 945, 950 (9th Cir. 1954); *see also Rice*, 330 F.3d at 1175–76; *Halicki*

*Films, LLC v. Sanderson Sales & Mktg.*, 547 F.3d 1213, 1224 (9th Cir. 2008). A character is not copyrightable under this test where "the character is only the chessman in the game of telling the story." *Warner Bros. Pictures*, 216 F.2d at 950. This is a high bar, since few characters so dominate the story such that it becomes essentially a character study.

*Warner Brothers* and *Towle* are two different tests for character copyrightability. *See Rice*, 330 F.3d at 1175 ("characters that are 'especially distinctive' *or* the 'story being told' receive protection apart from the copyrighted work" (emphasis added)). Thus, we do not embrace the district court's view that *Towle* represents the exclusive test for copyrightability.

The *Warner Brothers* test is therefore available, but it affords no protection to The Moodsters. Neither the Bible nor the pilot episode exhibits any prolonged engagement with character development or a character study of The Moodsters. Although the characters are introduced in the Bible, along with short descriptions, these pithy descriptions do not constitute the story being told. The pilot contains even less character development—rather, each of The Moodsters serves primarily as a means by which particular emotions are introduced and explored. The Moodsters are mere chessmen in the game of telling the story.

Daniels's final argument is that even if the individual Moodsters are not protectable under the *Towle* or "story being told" regimes, the ensemble of five characters *together* meets one or both of those tests. Daniels's ensemble claim does not change the distinctiveness or degree of delineation of the characters, and so The Moodsters as an ensemble are no more copyrightable than the individual characters.

The district court did not err in dismissing Daniels's claims for copyright infringement.

## II. Implied-in-Fact Contract

Daniels also puts forth a claim for breach of an implied-in-fact contract.  Under California law, a plaintiff can recover compensation for an idea conveyed to a counter-party where no explicit contract exists only where (1) "before or after disclosure he has obtained an express promise to pay," or (2) "the circumstances preceding and attending disclosure, together with the conduct of the offeree acting with knowledge of the circumstances, show a promise of the type usually referred to as 'implied' or 'implied-in-fact.'"  *Desny v. Wilder*, 46 Cal. 2d 715, 738 (1956).  The Ninth Circuit has developed a multi-part test to evaluate *Desny* claims, asking whether (1) the plaintiff prepared or created the work in question, (2) the work was disclosed to the defendant for sale, and (3) the disclosure was made "under circumstances from which it could be concluded that the offeree voluntarily accepted the disclosure knowing the conditions on which it was tendered and the reasonable value of the work."  *Grosso v. Miramax Film Corp.*, 383 F.3d 965, 967 (9th Cir. 2004).

Daniels's implied-in-fact contract claim is based on the disclosure of information about The Moodsters to various employees of Disney and its affiliates between 2005 and 2009.  These discussions were a part of Daniels's effort to find a partner with whom she could develop and grow the Moodsters brand and commercial opportunities.

There is no dispute that Daniels created the characters in question, and we accept as true that the alleged conversations took place.  But the existence of a conversation in which an

idea is disclosed is, by itself, an insufficient basis to support an implied-in-fact contract.

Daniels alleges that "she was aware and relied on customs and practices in the entertainment industry when she approached Disney•Pixar about a partnership," and that "Disney•Pixar accepted the disclosure of the ideas in *The Moodsters* with an expectation that it would have to compensate Daniels and The Moodsters Company if Disney•Pixar used this idea in any television, motion picture, merchandise, or otherwise."

But we are told no more. Daniels offers only bare allegations, stripped of relevant details that might support her claim for an implied-in-fact contract. No dates are alleged, and no details are provided. There is no basis to conclude that Disney either provided an express offer to pay for the disclosure of Daniels's idea or that the disclosure was made "under circumstances from which it could be concluded that [Disney] voluntarily accepted the disclosure knowing the conditions on which it was tendered and the reasonable value of the work." *Id.*

To survive a motion to dismiss, Daniels is required under California law to do more than plead a boiler-plate allegation, devoid of any relevant details. The district court did not err in dismissing Daniels's claim for an implied-in-fact contract.

## CONCLUSION

There is no dispute that the 2005 Moodsters Bible and the 2007 pilot television episode are protected by copyright. But Daniels cannot succeed on her copyright claim for The Moodsters characters, which are "lightly sketched" and neither sufficiently delineated nor representative of the story

being told.  Daniels also fails to allege sufficient facts to maintain an implied-in-fact contract claim against Disney under California law.

**AFFIRMED.**