**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CARROLL SHELBY LICENSING, INC., a California corporation; CARROLL HALL SHELBY TRUST,

       *Plaintiff-ctr-defendants - Appellees*,

  v.

DENICE SHAKARIAN HALICKI, an individual; ELEANOR LICENSING, LLC, a Delaware limited liability company; GONE IN 60 SECONDS MOTORSPORTS, LLC, a Delaware limited liability company,

       *Defendant-ctr-claimants - Appellants*,

CLASSIC RECREATIONS, LLC; JASON ENGEL; TONY ENGEL; SPEEDKORE PERFORMANCE GROUP, LLC,

No. 23-3731

D.C. No. 8:20-cv-01344-MCS-DFM

OPINION

Counter-defendants -
Appellees.

CARROLL SHELBY LICENSING,
INC.; CARROLL HALL SHELBY
TRUST,

   *Plaintiff-ctr-defendants -
   Appellants*,

 v.

DENICE SHAKARIAN HALICKI;
ELEANOR LICENSING, LLC;
GONE IN 60 SECONDS
MOTORSPORTS, LLC,

   *Defendant-ctr-claimants -
   Appellees*,

CLASSIC RECREATIONS, LLC;
JASON ENGEL; SPEEDKORE
PERFORMANCE GROUP, LLC;
TONY ENGEL,

   *Counter-defendants -
   Appellees*.

No. 23-4008
D.C. No.
8:20-cv-01344-
MCS-DFM

Appeal from the United States District Court
for the Central District of California
Mark C. Scarsi, District Judge, Presiding

Argued and Submitted March 24, 2025
Pasadena, California

Filed May 27, 2025

Before: Jacqueline H. Nguyen and Salvador Mendoza, Jr.,
Circuit Judges, and Jeremy D. Kernodle, District Judge.[*]

Opinion by Judge Kernodle

## SUMMARY[**]

### Copyright

The panel affirmed in part and reversed in part the district court's partial summary judgment and partial judgment after a bench trial in an action under the Copyright Act.

Denice Halicki and others alleged that Carroll Shelby Licensing, Inc., and Carroll Hall Shelby Trust's "GT-500CR" Ford Mustangs infringed Halicki's a copyright in "Eleanor," a collection of Mustangs featured across four films. The district court held on summary judgment that Eleanor was not entitled to character copyright protection. After a bench trial, the district court dismissed Halicki's breach of contract claim based on a settlement

---

[*] The Honorable Jeremy D. Kernodle, United States District Judge for the Eastern District of Texas, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

agreement and denied Shelby's request for a declaration that the GT-500CR did not infringe any of Halicki's rights.

Affirming the district court's summary judgment, the panel held that under the *Towle* test, Eleanor was not entitled to character copyright protection because it (1) did not have conceptual qualities, (2) did not have consistent traits, and (3) was not especially distinctive.

Affirming in part the district court's judgment after trial, the panel held that, under California contract law, Shelby did not violate the parties' settlement agreement, which prohibited Shelby from manufacturing or licensing cars copying only Eleanor's distinctive hood and inset lights.

Applying a de novo standard of review, the panel reversed the district court's denial of declaratory relief and remanded for the purpose of issuing the appropriate declaration. The panel concluded that a declaration would clarify and settle the legal relations at issue between Shelby and Halicki and would afford Shelby relief from the uncertainty giving rise to this proceeding.

---

## COUNSEL

Irene Y. Lee (argued), Larry C. Russ, Jean Y. Rhee, and Nathan D. Meyer, Russ August & Kabat, Los Angeles, California; Caroline H. Mankey, Akerman LLP, Los Angeles, California; for Plaintiff-ctr-defendants-Appellees.

Stefan C. Love (argued), Timothy T. Coates, and Gary J. Wax, Greines Martin Stein & Richland LLP, Los Angeles, California; David L. Brandon, Clark Hill LLP, Los Angeles, California; for Defendant-ctr-claimants-Appellants.

Marina V. Bogorad (argued) and Anton N. Handal, Munck Wilson Mandala LLP, Los Angeles, California; Pamela C. Chalk, Doctor Multimedia, La Jolla, California; Counter-defendants-Appellees.

Scott A. Burroughs, Doniger Burroughs APC, New York, New York; Steven T. Lowe, Lowe & Associates, Los Angeles, California; for Amicus Curiae National Society of Entertainment & Arts Lawyers.

Charles S. Duan, American University Washington College of Law, Washington, D.C., for Amici Curiae 20 Professors of Law and Public Knowledge.

## OPINION

KERNODLE, District Judge:

The central question in this case is whether "Eleanor" is a copyrightable character. Eleanor is a collection of Ford Mustangs featured across four films, most recently in *Gone in 60 Seconds* (2000). Appellants argue that Eleanor is copyrightable under this Court's test for independent character copyright protection. *See DC Comics v. Towle*, 802 F.3d 1012, 1021 (9th Cir. 2015).

But Appellants' argument stalls at the starting line: we hold that Eleanor is not a character, much less a copyrightable one. As explained below, we affirm in part and reverse in part.

## I.  BACKGROUND

### A.  The Films

At the heart of this case are four films:  *Gone in 60 Seconds* (1974), *The Junkman* (1982), *Deadline Auto Theft* (1983), and the remake of *Gone in 60 Seconds* (2000).  The films feature several Ford Mustangs called "Eleanor."  A summary of each film is helpful to the forthcoming analysis.

In the original *Gone in 60 Seconds*, the film's protagonist and his team are tasked with stealing forty-eight types of cars.  To discuss the targets discreetly, each type of vehicle is assigned a common, feminine codename such as "Donna" or "Karen."  One target, a yellow Fastback Ford Mustang with black stripes, is designated "Eleanor."  The protagonist encounters four "Eleanors" throughout the film, stealing all of them and driving one in a climactic police chase.

In a meta turn, *The Junkman* features a protagonist who is the fictional director of *Gone in 60 Seconds*—a film within the film.  The plot involves the protagonist evading an assassination attempt before the fictional premiere of *Gone in 60 Seconds*.  "Eleanor" is made to look like the vehicle that the protagonist drove and severely damaged in the climactic police chase in *Gone in 60 Seconds*.  The side of the car is painted with the message:  "'Eleanor' from the movie *Gone in 60 Seconds*," and a pull quote exclaiming, "The most hair raising chase scene ever filmed!"

*Deadline Auto Theft* recycles and repurposes footage from the first two films in service of a slightly revised plot of the original *Gone in 60 Seconds*.  Accordingly, Eleanor's appearances are largely the same as in the original.

The *Gone in 60 Seconds* remake features a familiar plot. The protagonist must steal fifty cars within a few days to

save his brother's life from a gangster. Again, a common, feminine codename is designated for each type of car targeted. This time, "Eleanor" is the codename for a Shelby GT-500 Ford Mustang. Two versions of Eleanor appear in the film. The first is gray with black stripes and is stolen by the protagonist and driven in a climactic police chase. The second is rusty and stripped of paint, gifted to the protagonist at the film's conclusion.

## B. Preceding Litigation

This case is not the beginning of the parties' disagreement.[1] Halicki owns the copyrights to the first three films and the merchandising rights to Eleanor as it appears in the remake film. After the remake's release in the early 2000s, Shelby licensed a custom car shop to produce "GT-500E" Mustangs. Believing that the car unlawfully copied Eleanor's design, Halicki filed suit against Shelby and the car shop for several claims, including copyright infringement. Halicki and Shelby ultimately settled the lawsuit in 2009.

The peace did not last. Shortly after the settlement, Shelby licensed CR to produce "GT-500CR" Mustangs. Halicki interpreted this as a violation of the settlement agreement. Accordingly, Halicki contacted GT-500E owners and auction houses to assert a copyright interest in

---

[1] Appellants and Cross-Appellees are Denice Halicki and her corporate entities Eleanor Licensing, LLC, and Gone in 60 Seconds Motorsports, LLC. For brevity, we collectively refer to these parties as "Halicki." Appellees and Cross-Appellants are Carroll Shelby Licensing, Inc., and Carroll Hall Shelby Trust. For brevity, we collectively refer to these parties as "Shelby." The remaining Appellees are Classic Recreations, LLC, and its sole members Jason Engel and Tony Engel. For brevity, we collectively refer to these parties as "CR."

the vehicles, and also contacted CR to demand they cease and desist in the production of GT-500CRs.

Shelby thereafter initiated this lawsuit, asserting several claims against Halicki, including for breach of the settlement agreement and declaratory relief.  Halicki brought counterclaims, including for copyright infringement and breach of the settlement agreement.  Halicki also named CR as a third-party defendant and asserted several claims, including for copyright infringement.

Three holdings by the district court are relevant in this appeal.  First, in resolving cross motions for summary judgment, the district court held that Eleanor was not entitled to character copyright protection.  Second, after a bench trial, the district court dismissed Halicki's breach of contract claim against Shelby based on the settlement agreement.  Third, also after a bench trial, the district court denied Shelby's request for a declaration that the GT-500CR does not infringe any of Halicki's rights.

We affirm on all grounds except as to the denial of declaratory relief, which we reverse and remand for further proceedings.

## II.  CHARACTER COPYRIGHTABILITY

We begin with the question of whether Eleanor is entitled to character copyright protection. [2]  We review questions of character copyrightability de novo.  *Towle*, 802

---

[2] Another panel of this court previously suggested that Eleanor could be a character entitled to copyright protection.  *See Halicki Films, LLC v. Sanderson Sales & Mktg.*, 547 F.3d 1213, 1225 (9th Cir. 2008).  But this was dicta.  The court acknowledged it was a "fact-intensive issue [that] must be remanded to the District Court" to address in the first instance.  *Id.*

F.3d at 1019.  However, because "the district court here addressed this question in detail, we consider its factual findings in analyzing this issue."  *Id.* at 1021.

## A.  *Towle* Test

Federal copyright law enumerates several categories of protected subject matter, such as literary works, motion pictures, and more.  *See* 17 U.S.C. § 102(a).  Although the statute is silent as to the protection of the characters within these enumerated works, "there is a long history of extending copyright protection to graphically-depicted characters." *Daniels v. Walt Disney Co.*, 958 F.3d 767, 771 (9th Cir. 2020).  But "not every comic book, television, or motion picture character is entitled to copyright protection."  *Id.* (quoting *Towle*, 802 F.3d at 1021) (cleaned up).

In *Towle*, we established a test to determine whether a character is entitled to copyright protection:    (1) the character must have "physical as well as conceptual qualities," (2) the character must be "sufficiently delineated to be recognizable as the same character whenever it appears" and display "consistent, identifiable character traits and attributes," and (3) the character must be "especially distinctive" and contain "some unique elements of expression."  *Daniels*, 958 F.3d at 771 (quoting *Towle*, 802 F.3d at 1021) (cleaned up).

As we explain below, Eleanor fails at each prong of the *Towle* test.  Accordingly, Eleanor is not entitled to character copyright protection.

## B.  Application of the *Towle* Test to Eleanor

1.  We first ask whether Eleanor is a character with "physical as well as conceptual qualities."  *Id.*  Our precedent has primarily focused on "physical" qualities.  *See, e.g.*, *id.*

(finding that characters satisfied prong one of *Towle* "[b]ecause they have physical qualities . . . [and thus] are not mere literary characters"); *Towle*, 802 F.3d at 1021 (finding the Batmobile satisfied prong one because it "appeared graphically in comic books, and as a three-dimensional car in television series and motion pictures, . . . and is thus not a mere literary character"); *Walt Disney Producs. v. Air Pirates*, 581 F.2d 751, 755 (9th Cir. 1978) (explaining the importance of "a visual image" for character copyrightability).

But equally important are the "conceptual" qualities that all characters inherently possess. These include anthropomorphic qualities, acting with agency and volition, displaying sentience and emotion, expressing personality, speaking, thinking, or interacting with other characters or objects. *See Daniels*, 958 F.3d at 770–71 (finding "anthropomorphic emotions" to be characters that satisfy prong one); *Moonbug Entm't Ltd. v. BabyBus (Fujian) Network Tech. Co., Ltd.*, 2023 WL 11922845, at *7 (N.D. Cal. Mar. 7, 2023) (listing as "conceptual elements" of a character: feeling emotion, acting with agency, talking, moving, interacting with objects, and thinking); *Daniels v. Walt Disney Co.*, 2018 WL 4849700, at *6 (C.D. Cal. Jan. 31, 2018) (listing as character traits: speaking, interacting with other characters, acting with agency, and personality), *aff'd*, 958 F.3d 767 (9th Cir. 2020); *Toho Co. v. William Morrow & Co.*, 33 F. Supp. 2d 1206, 1216 (C.D. Cal. 1998) (noting the morality, sentience, and actions of Godzilla's character); *Metro-Goldwyn-Mayer, Inc. v. Am. Honda Motor Co.*, 900 F. Supp. 1287, 1296 (C.D. Cal. 1995) (noting the particular personality, emotions, and behaviors of James Bond's character).

Of course, these conceptual qualities are by no means limited to human characters. Animals, objects, or even anthropomorphized emotions may possess the conceptual qualities of a character. *See, e.g.*, *Air Pirates*, 581 F.2d at 753 & n.5, 755 (finding several animal characters "endowed with human qualities" to be copyrightable, including "Mickey and Minnie Mouse, Donald Duck, the Big Bad Wolf, the Three Little Pigs, and Goofy"); *Toho*, 33 F. Supp. 2d at 1215 (finding Godzilla is a copyrightable character); *Towle*, 802 F.3d at 1022 (finding the Batmobile is a copyrightable character); *Daniels*, 958 F.3d at 770–71 (noting "anthropomorphic emotions" were characters). Indeed, we have found a car to be a copyrightable character where it expressed personality and a demonstrated level of autonomy. **[3]** *Towle*, 802 F.3d at 1022 (describing the Batmobile as "loyal" to Batman); *id.* at 1021 (describing the Batmobile as "waiting like an impatient steed straining at the reins shivering as its super-charged motor throbs with energy before it tears after the fleeing hoodlums" (cleaned up)); *see also* Brief of 20 Professors of Law and Public Knowledge as Amici Curiae Supporting Appellants, at 15 (explaining that the Batmobile is "an autonomous-driving car with substantial intelligence—for example, politely stopping for passing children while driving itself " to Batman's aid).

Eleanor, however, lacks any such conceptual qualities. Indeed, Eleanor has no anthropomorphic traits. The car never acts with agency or volition; rather, it is always driven by the film's protagonists. Eleanor expresses no sentience,

---

[3] We noted in *Towle* that a character can still be protectable even if it "lacks sentient attributes and does not speak (like a car)." 802 F.3d at 1021. This remains true. Sentience and the ability to talk are just two of many conceptual qualities of a character already discussed.

emotion, or personality.**[4]**  Nor does Eleanor speak, think, or otherwise engage or interact with the films' protagonists. Instead, Eleanor is just one of many named cars in the films. In this way, Eleanor is more akin to a prop than a character. Accordingly, Eleanor fails at prong one of the *Towle* test.**[5]**

2.    Turning to prong two of *Towle*, we ask whether Eleanor is "sufficiently delineated to be recognizable as the same character whenever it appears" and "display[s] consistent, identifiable character traits and attributes." *Daniels*, 958 F.3d at 771 (quoting *Towle*, 802 F.3d at 1021). "Although a character that has appeared in multiple productions or iterations 'need not have a consistent appearance,' it 'must display consistent, identifiable character traits and attributes' such that it is recognizable whenever it appears." *Id.* (quoting *Towle*, 802 F.3d at 1021).

---

[4] Halicki suggests that Eleanor does have some anthropomorphic qualities.  For example, Halicki notes that in the remake, "Eleanor's engine sputters and dies—suggesting possible jealousy, because [the protagonist's] girlfriend is in the car."  But this is pure speculation. Halicki is referring to the Eleanor gifted to the protagonist at the end of the remake.  This version of Eleanor was rusty, old, and in clear need of maintenance work.  A reasonable viewer attributes the breakdown to the car's poor condition, not Eleanor's feelings.

[5] Halicki briefly argues that Eleanor as it appears only in the remake is also independently copyrightable under *Towle*.  But Halicki cites no case where a character appeared in multiple works, and a court found the character to be copyrightability based on only a limited subset of those works.  And our precedent suggests that if a character appears in multiple works, we consider all such works.  *See Daniels*, 958 F.3d at 770, 773 (considering "every iteration" of the Moodsters including a pitchbook, a television episode, and a line of toys and books); *Towle*, 802 F.3d at 1016 (considering the Batmobile "since its creation," including in comic books, TV shows, and films).  In any event, for the same reasons already discussed, "remake Eleanor" similarly fails prong one of *Towle* and is not entitled to copyright protection.

"By contrast, a character that lacks a core set of consistent and identifiable character traits and attributes is not protectable, because that character is not immediately recognizable as the same character whenever it appears." *Id.* Indeed, the "key" analysis is the "persistence" of those core traits. *Towle*, 802 F.3d at 1020.

Here too, Eleanor fails. Across four films and eleven iterations in those films, Eleanor lacks consistent traits. For example, Eleanor's physical appearance changes frequently throughout the various films, appearing as a yellow and black Fastback Mustang, a gray and black Shelby GT-500 Mustang, and a rusty, paintless Mustang in need of repair. Indeed, the latter Eleanors are unrecognizable until introduced as Eleanor by the protagonists. Halicki's proffered Eleanor traits, moreover, only serve to further highlight Eleanor's inconsistencies. Halicki claims Eleanor is always "incurring severe damage" and is "hard to steal." But fewer than half of the Eleanors ever appear damaged at all, and the damage ranges from body damage incurred by a police chase, to cosmetic damage, to being entirely shredded for scrap. And of the Eleanors stolen by the films' protagonists, most were stolen with little difficulty. Halicki also claims that Eleanor is "good at evading police" and "surviving spectacular jumps." But these traits are more readily attributable to the films' protagonists driving the cars, not to Eleanor. In sum, Eleanor is too "lightly sketched" to satisfy prong two of the *Towle* test. *See Daniels*, 958 F.3d at 771.

3. Finally, under prong three of *Towle*, we consider whether Eleanor is "especially distinctive" and "contain[s] some unique elements of expression." *Id.* at 773 (quoting *Towle*, 802 F.3d at 1021). To meet prong three, a character "cannot be a stock character such as a magician in standard

magician garb." *Towle*, 802 F.3d at 1021. Nor is a character especially distinctive if it "fit[s] general, stereotypical categories" like "an older scholar," a "loyal friend," or a "military leader." *McCormick v. Sony Pictures Entm't*, 2009 WL 10672263, at *14 (C.D. Cal. July 20, 2009), *aff'd*, 411 Fed. App'x 122 (9th Cir. 2011).

Eleanor is not especially distinctive. Nothing distinguishes Eleanor from any number of sports cars appearing in car-centric action films. *Cf. Towle*, 802 F.3d at 1021–22 (highlighting the Batmobile's distinct "bat-like appearance," "jet engines and flame-shooting tubes," and "ability to maneuver that far exceeds that of an ordinary car"). Nor is the name Eleanor unique; rather, it is a common female name—the normalcy of which was the entire point of codenaming vehicles in the films. *Cf. id.* at 1022 (noting the Batmobile's "unique and highly recognizable name"). Eleanor is a "stock" sports car and fails prong three of *Towle*. *See id.* at 1021.

*     *     *

In sum, Eleanor is not really a character. And even if Eleanor were a character, it is not entitled to copyright protection under *Towle*. Accordingly, we **AFFIRM** the judgment of the district court that Eleanor is not entitled to character copyright protection.[6]

### III.  SETTLEMENT AGREEMENT

We next consider Halicki's claim that by licensing the GT-500CR, Shelby violated the parties' settlement agreement. Contract interpretation is a question of law that

---

[6] The parties raise additional issues that are contingent upon a finding that Eleanor is a copyrightable character. Because Eleanor is not copyrightable, we need not reach these issues.

we review de novo.  *Schertzer v. Bank of Am., NA*, 109 F.4th 1200, 1208 (9th Cir. 2024).

California contract law controls here.  A contract's language governs its interpretation so long as it is clear, explicit, and does not involve an absurdity.  CAL. CIV. CODE § 1638.  California law provides several principles of contract interpretation to guide a court's analysis:  (1) terms receive their ordinary and popular meaning unless a technical or special meaning should apply;  (2) an interpretation giving effect to all provisions is favored over an interpretation rendering some provisions superfluous;  (3) contracts should be read as a whole; and (4) absurd interpretations should be avoided.  *Schertzer*, 109 F.4th at 1208–11.

Under California law, courts also consider extrinsic evidence if it supports a proffered interpretation of a disputed term.  *Id.* at 1212.  Extrinsic evidence is admissible if "the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible."  *Id.* (quoting *Dore v. Arnold Worldwide, Inc.*, 39 Cal. 4th 384, 391 (2006)).

The dispositive issue here is whether the settlement agreement prohibits Shelby from manufacturing or licensing cars copying (1) *any* of Eleanor's distinctive features or (2) *only* Eleanor's distinctive hood and inset lights.  The district court held that the latter interpretation was correct. We agree.

A natural reading of the settlement agreement supports this interpretation.  Section 4 of the agreement prohibits Shelby from manufacturing or licensing the "exaggerated, raised hump feature of the Eleanor hood" or the "specific design of the Eleanor small dual headlights ['Eleanor inset

lights']." This is the only provision prohibiting Shelby from copying any specific Eleanor features. Because the text means what it says, we find the settlement agreement prohibits Shelby from copying only Eleanor's distinct hood and inset lights.

We are unpersuaded by Halicki's counterargument, which attempts to rewrite the settlement agreement and broaden the prohibition to include additional distinct Eleanor features. To do so, Halicki draws on §§ 8 and 17 of the agreement.

Halicki first cherry-picks § 8's use of the term "Eleanor." Section 8 of the agreement is an acknowledgement by Shelby that Halicki may continue to license "Eleanors." Both parties agreed not to file suit against each other, and Shelby specifically agreed not to sue Halicki for licensing "Eleanors . . . as embodied in the photograph attached" to the agreement—a photograph that includes a list of eleven distinct Eleanor features. The term "Eleanor," Halicki argues, must be interpreted to include that list of features every time it is used throughout the agreement—including § 17.

Halicki then relies on § 17 of the agreement. Section 17 is a narrow provision explaining how Shelby was to finish fulfilling its pre-existing "Eleanor contracts" with outstanding customers. It required Shelby to use its "best efforts to convince the customers to choose a different car that doesn't have the Eleanor hood and Eleanor inset lights," as prohibited by § 4. Halicki argues that § 17 creates two paths for these customers: (1) the customer *is not persuaded* by Shelby—therefore they receive a car with all Eleanor features *including* the hood and inset lights; or (2) the customer *is persuaded* by Shelby—therefore they receive a

car with all distinctive Eleanor features *except* the hood and inset lights.

Having set up this false dichotomy, Halicki proceeds to another sentence in § 17 to complete the interpretive maneuver.  Section 17 states:  "Other than as set forth above, Shelby . . . shall not manufacture or sell any Eleanors."  The phrase "as set forth above," Halicki argues, refers to both "Eleanors" in the two paths above; that is, Shelby is prohibited from manufacturing cars mimicking (1) all of Eleanor's distinctive features including the Eleanor hood and lights; *and* (2) all of Eleanor's distinctive features other than the hood and lights.   The effect of Halicki's interpretation, then, is that the agreement prohibits Shelby from producing cars copying *any* of Eleanor's distinctive features, not just the hood and lights.

We will not adopt this expansive reading of the settlement agreement.   Halicki's use of § 8 to define "Eleanor" in the agreement is unavailing.  The parties knew how to define terms because they did so in § 1.  They did not do so for "Eleanor."   And this makes sense because "Eleanor" is used in different ways throughout the agreement, including as a character, a trademark, an idea embodied in appended photographs, and a type of contract. As such, the use of "Eleanor" in § 17 should be interpreted within the context it is used.  And § 17 makes clear in context that "Eleanor" refers to a car with the prohibited Eleanor hood or inset lights.

Halicki's reading of § 17, moreover, suffers from several problems.  *First*, Halicki's interpretation relies on a flawed assumption:  that customers who "choose a different car" simply redesign their cars to exclude the Eleanor hood and inset lights but retain all other distinctive Eleanor features.

But the text makes no such assumption, and we decline to read it into the agreement. *See* CAL. CIV. PROC. CODE § 1858 (explaining that when interpreting contracts, judges are "simply to ascertain and declare" its meaning, "not to insert what has been omitted, or to omit what has been inserted"). *Second*, Halicki's interpretation renders § 4 superfluous. If § 17 prohibits Shelby from making cars copying any of Eleanor's distinctive features, then § 4's specific prohibition regarding Eleanor's hood and inset lights need not exist. *See Schertzer*, 109 F.4th at 1209 ("An interpretation which gives effect to all provisions of the contract is preferred to one which renders part of the writing superfluous, useless or inexplicable." (quoting *Carson v. Mercury Ins. Co.*, 210 Cal. App. 4th 409, 420 (2012))). *Third*, and in the same vein, Halicki's interpretation foregoes common sense. Why would the parties explicitly prohibit Shelby from copying the Eleanor hood and inset lights in § 4 only to bury a far broader prohibition deep within § 17? Halicki cannot say.

Finally, Halicki offers extrinsic evidence that the settlement agreement was meant to create "permanent peace" and "completely resolve" the parties' Eleanor issue. But we need not consider such evidence as it sheds no light on the agreement's meaning. *See Schertzer*, 109 F.4th at 1212 (explaining "we consider extrinsic evidence *if it supports a proffered interpretation*" (emphasis added)). And it is rather unremarkable given that every settlement agreement is meant to create lasting peace.

Accordingly, we **AFFIRM** the judgment of the district court that Halicki fails to establish a breach of contract claim against Shelby based on the settlement agreement.

## IV.   DECLARATORY RELIEF

Finally, we consider Shelby's cross appeal seeking a declaration that the GT-500CR does not infringe any of Halicki's rights.  After a bench trial, the district court denied Shelby's requested declaratory relief.

We begin by addressing the appropriate standard of review on appeal.  This Court's precedent is difficult to square.  One line of cases says to review the denial of declaratory relief de novo.  *See Oregon Coast Scenic R.R., LLC v. Oregon Dep't of State Lands*, 841 F.3d 1069, 1072 (9th Cir. 2016); *United States v. Washington*, 759 F.2d 1353, 1356–57 (9th Cir. 1985) (en banc).  Other cases say we review for abuse of discretion.  *See Rigsby v. GoDaddy Inc.*, 59 F.4th 998, 1010 (9th Cir. 2023); *Arizona v. City of Tucson*, 761 F.3d 1005, 1009–10 (9th Cir. 2014).

We apply a de novo standard here for two reasons.  First, the parties agree it is the proper standard.  Second, it appears that our precedent applying an abuse of discretion standard may have been an error.[7]

Here, reviewing the district court's denial of declaratory relief de novo, we reverse and remand.  The Declaratory Judgment Act permits "any court" to "declare the rights and other legal relations of any interested party seeking such declaration."  28 U.S.C. § 2201(a).  Declaratory relief is appropriate "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue,

---

[7] To begin with, *Rigsby* cites *Arizona* to establish that an abuse of discretion standard applies.  Then, *Arizona* cites *California Ass'n of Rural Health Clinics v. Douglas*, 738 F.3d 1007 (9th Cir. 2013).  The problem, however, is that *Douglas* clearly states that we "review de novo a grant of declaratory relief."  *Douglas*, 738 F.3d at 1011.  Accordingly, *Arizona*'s citation to *Douglas* appears to be an error.

and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Small v. Allianz Life Ins. Co. of N. Am.*, 122 F.4th 1182, 1201 (9th Cir. 2024) (quoting *Guerra v. Sutton*, 783 F.2d 1371, 1376 (9th Cir. 1986)).

This standard is met here. First, a declaration will clarify and settle the legal relations at issue between Shelby and Halicki. Indeed, the briefing makes clear that the parties disagree as to which claims remain unresolved after the district court proceedings. Second, a declaration will afford Shelby relief from the uncertainty giving rise to this proceeding. For example, Halicki issued a press release following the district court's bench verdict making it appear that she will likely continue to hassle Shelby going forward based on the denial of declaratory relief. Halicki, moreover, has a history of mischaracterizing this Court's opinions.

Having determined Shelby is entitled to declaratory relief, we offer brief guidance on the proper scope. Shelby is entitled to a declaration that is consistent with what has been adjudicated in this case. Accordingly, it would seem appropriate to declare that the GT-500CR does not infringe on Halicki's copyright interests in Eleanor or contractual rights under the settlement agreement. In considering the latter, the district court denied relief because Shelby failed to prevail on its own breach of contract claim. But that conflated Shelby's affirmative breach of contract claim (arguing that Halicki breached the settlement agreement) with its declaratory relief claim (seeking a declaration that Shelby did not breach the settlement agreement). Finally, we would also be inclined to grant Shelby's request for declarative relief as to the trademark and trade dress rights for the reasons stated in Shelby's briefing.

Sensitive to the fact-intensive nature of declaratory relief, however, we conclude that it is appropriate to remand the issue for full consideration by the district court in the first instance.  Accordingly, we **REVERSE** the district court's denial of declaratory relief and **REMAND** for the narrow purpose of issuing the appropriate declaration.

## V.  CONCLUSION

We **REVERSE** and **REMAND** only as to the district court's denial of declaratory relief to Shelby.  We **AFFIRM** on all other grounds.